In re MAIN, INC., Debtor.

In re Eric J. BLATSTEIN, Debtor.

718 ARCH STREET ASSOCIATES,
LTD. and Mitchell W. Miller,
Trustee, Plaintiffs,

v.

Eric J. BLATSTEIN, Debtor, Main, Inc.,
Debtor, Lori J. Blatstein, Delawareco,
Inc. t/a Maui, Engine 46 Steak House,
Inc.; Reedco, Inc. t/a Margarita Cafe,
Waterfront Management Corporation
Columbusco, Inc., Airbev, Inc., and Pier
53 North, Inc., Defendants.

718 ARCH STREET ASSOCIATES,
LTD., Plaintiff,

v.

Eric J. BLATSTEIN, Main, Inc., Lori J.
Blatstein, Morris Lift, Delawareco, Inc.
t/a Maui, Engine 46 Steak House, Inc.;
Reedco, Inc: t/a Margarita Cafe, Water-
front Management Corporation Colum-
busco, Inc., Airbev, Inc., and Pier 53
North, Inc., Defendants.

Bankruptcy Nos. 96–19098DAS,
96–31813DAS.
Adversary Nos. 97–0004DAS, 97–0008DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 8, 1997.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Main, Inc.

Edward J. DiDonato, DiDonato & Winterhalter, P.C., Philadelphia, PA, for Eric J. Blatstein.

Mitchell W. Miller, Philadelphia, PA, Trustee in Main Case.

Michael H. Kaliner, Fairless Hills, PA, Trustee in Blatstein Case.

Steven M. Coren, Philadelphia, PA, for 718 Arch Street Associates, Ltd.

Kevin J. Carey, Mesirov Gelman Jaffe Cramer & Jamieson, Philadelphia, PA, for Lori J. Blatstein.

Mary F. Walrath, Philadelphia, PA, for Non-Debtor Corporate Defendants in Proceedings.

W.J. Winterstein, Jr., Philadelphia, PA, for Morris Lift.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, United States Trustee.

*OPINION*

DAVID A. SCHOLL, Chief Judge.

## A. INTRODUCTION

Presently before this court are, principally, two nearly-identical proceedings ("the Proceedings") arising out of the individual voluntary Chapter 7 bankruptcy case of ERIC J. BLATSTEIN ("Blatstein") and the case of one of his corporations, MAIN, INC. ("Main," with Blatstein, "the Debtors") The plaintiffs in the Proceedings are a creditor of the Debtors, 718 ARCH STREET ASSOCIATES, LTD. ("Arch"), and MITCHELL W. MILLER, ESQUIRE, and MICHAEL KALINER, ESQUIRE, the trustees ("the Trustees," with Arch, "the Plaintiffs") of Main and Blatstein, respectively. The Plaintiffs very ambitiously attempt to have us collapse Main and several other non-debtor entities owned by Blatstein and his wife, LORI J. BLATSTEIN ("Lori"), into a single entity under theories that all of these entities are the collective alter ego of Blatstein and that numerous transfers among the entities and from Blatstein to Lori are fraudulent conveyances. In addition, the Plaintiffs challenge the discharge of Blatstein under 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(7), the latter claim arising out of his actions with respect to Main. Also before the court is Arch's objection to a secured proof of claim in the amount of $492,445.41 filed by Morris Lift, the long-time accountant of the Blatstein family who obstensibly foreclosed upon his security interests on Main's principal assets shortly before its bankruptcy filing and who is presently Main's president.

Considering a large record compiled over several full days of trial, we conclude that a portion of the Plaintiffs' claims have merit.

We find that Lift has been an "insider" of both of the Debtors in the critical months prior to the Debtors' filings; that his foreclosure of Main's assets was, under the circumstances, a sham transaction; and that his claim against Main must be disallowed. We also find that the transfer of most or all of Main's assets to a series of other Blatstein-controlled entities within the year prior to the bankruptcy filings constituted "actual" fraudulent conveyances which must be set aside. As a result, Main's assets must be placed into the hands of Trustee Miller, although we reserve judgment on when and how this aspect of our Order shall be effected. Further, we conclude that, as the undisputed protagonist of Main's actual fraudulent transfers, Blatstein must perforce be denied a discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(7). However, we also conclude that, despite Arch's exhaustive efforts, the Plaintiffs have failed to meet their burden of proving the propriety of any broader relief relevant to transfer of Blatstein's assets to Lori or transfer among the Debtors and the related non-debtor entities.

Although our within Order is intended to be final and, if any interested parties are so inclined, immediately appealable, we will schedule a status hearing on September 23, 1997, to ascertain how our Order regarding the fraudulent transfers is to be effected. At that time, we will also attempt to determine how we should proceed on the remand by the district court, in *In re Blatstein,* C.A. No. 97–3739, 1997 WL 560119 (E.D.Pa. August 26, 1997) (*"Blatstein I "*), which decision reversed in part our decision reported as *In re Main, Inc.,* 207 B.R. 832 (Bankr.E.D.Pa. 1997) (*"Main I "*). These decisions addressed the allowable amount of Arch's claim against the Debtors against the Debtors arising from the termination of a lease of one of Blatstein's prior corporate entities in light of 11 U.S.C. § 502(b)(6).

## B. *FACTUAL AND PROCEDURAL HISTORY*

As we indicated in *Main I, supra,* 207 B.R. at 834, Main filed the initial underlying bankruptcy case as a voluntary Chapter 11 petition on September 20, 1996. It converted this bankruptcy case from Chapter 11 to Chapter 7 after a December 18, 1996, hearing before this court on a motion to dismiss that case filed by Arch. Subsequently, Blatstein filed his Chapter 7 case *pro se* on December 19, 1996, although he obtained counsel to represent him after Arch's participation in these cases became prominent. Arch ultimately withdrew efforts to have Kaliner, appointed as Blatstein's trustee, serve in both cases, and Miller's interim appointment in Main's case was allowed to stand. *See id.* at 834–35.

On January 3, 1997, and January 7, 1997, Arch filed the Proceedings before us in the Blatstein and Main cases, respectively. Named as Defendants in both Proceedings were both Debtors, Lori, Lift, and the following non-debtor entitled owned by Blatstein: DELAWARECO, INC. ("Delawareco"), a corporation which owns and operates the Maui nightclub, incorporated on March 9, 1992; ENGINE 46 STEAK HOUSE, INC. ("Engine 46"), which operates a family restaurant incorporated on March 16, 1995; REEDCO, INC. ("Reedco"), incorporated on December 18, 1995, which owns and operates the Margarita Cafe; WATERFRONT MANAGEMENT CORPORATION ("Waterfront"), incorporated on January 10, 1996, to serve as a consulting and management firm to run all of the businesses owned by the Blatsteins; COLUMBUSCO, INC. ("Columbusco"), incorporated on May 2, 1996, which, effective July 1, 1996, took over the ownership and operations of Philly Rock Bar and Grill ("Philly Rock"), which had previously been owned and operated by Main, shortly before Lift "foreclosed" on Main's assets; AIRBEV, INC. ("Airbev"), which operates three bars and a Philly Rock at the Philadelphia International Airport, and was incorporated on November 6, 1995; and PIER 53 NORTH, INC. ("Pier 53"), incorporated on November 22, 1993, which owns the real property on which the Maui nightclub is located.

The Complaints in the Proceedings set forth three legal claims. The first alleges that the Defendants made fraudulent transfers of the property of Main in violation of 12 Pa.C.S. § 5104. The second claim avers that

the Defendants conspired to defraud Arch. The third claim is Arch's objection to the discharge of Blatstein's bankruptcy case under 11 U.S.C. §§ 727(a)(2) and (a)(7) of the Bankruptcy Code based on his alleged intent to hinder, delay or defraud Arch; the transfer and concealment of his property within one year of the filing of his bankruptcy petition; and a one-paragraph invocation of 11 U.S.C. § 523(a)(6) to challenge the dischargeability of Arch's particular debt. Answering the Complaint, by separate counsel, were both Debtors, Lift, Lori, and (by one counsel) all of the non-debtor corporate entities. On the first trial date of February 11, 1997, the parties agreed to continue the trial, on a must-be-heard basis, to May 1, 1997.

Shortly prior to the trial, we held a hearing of April 15, 1997, to consider Objections to Arch's proof of claim filed by the Debtors ("the Arch Objections"). As *Main I* explains, 207 B.R. at 835–36, Arch's claim arises from a course of action for rents arising when an earlier Blatstein entity, Archco Enterprises, Inc. ("Archco"), abruptly ceased operation of the Phoenix nightclub on Arch's premises on April 6, 1992. Because the Debtors argued that sustaining the Arch Objections could eliminate Arch's claim entirely, we were obliged to resolve the Arch Objections very expeditiously, prior to the May 1, 1997, trial date. On April 23, 1997, one day after the briefs were submitted, we filed *Main I*, which reduced Arch's claims of over $3,000,000 to $269,159.00 pursuant to § 502(b)(6). Cross-appeals were sustained in part in *Blatstein I*. Although *Blatstein I* reversed several of the specific items excluded and included in our calculations, it sustained the core of *Main I*. It appears that Arch's claim will, after possibly a hearing to re-establish the date of Archco's "surrender"

or "repossession" of Arch's premises, result in a claim in the $350,000 to $400,000 range.[1]

On April 17, 1997, and April 18, 1997, the Trustees began a flurry of last-minute, pretrial filings by each moving to join as parties plaintiff in the Proceedings. On April 24, 1997, over opposition from several of the Defendants, we granted these motions.

On April 25, 1997, the Defendants filed a joint expedited motion in limine seeking to prevent the Plaintiffs from presenting, at the trial of the Proceedings, evidence relating to alleged fraud, conspiracy to commit fraud, or alter ego claims which took place prior to two years before the date on the respective bankruptcy filings, on the ground that such events were beyond all applicable statutes of limitations. On April 27, 1997, the Plaintiffs moved to amend the Complaints in the Proceedings to add fraudulent transfer claims under 11 U.S.C. § 548 and claims seeking the denial of a discharge to Blatstein under §§ 727(a)(3) and (a)(4). Just before the commencement of the trial on May 1, 1997, we denied the motion in limine without prejudice to revisit the issues referenced therein as defenses, and allowing the motion to amend to add the § 548 claim and the § 727(a)(3) to the extent that Arch invoked the latter Code Section in a so-called "supplemental Objection and Exemptions to Discharge" of Blatstein ("the Supplement") filed on April 11, 1997, the established bar date for filing such claims. The reference in the Supplement to § 727(a)(4) was found to be too vague to support a claim.[2]

The consolidated trial of the Proceedings began on May 1, 1997, and continued for a substantial portion of May 7, May 9, May 12, May 21, and May 30, 1997. On May 9, 1997, we also heard and denied a motion of Lift to reconsider our refusal to deduct Archco's

---

1. In our accompanying order, we direct the parties to re-compute Arch's claim following the *Blatstein I* holdings and to advise us whether they deem a further hearing necessary or appropriate. It is perhaps appropriate to remind the parties that consensual agreements on issues is preferable to unpredictable court decisions. We also note that several of the issues addressed in *Blatstein I* were, by our recollection, either not raised or argued very superficially before this court in the need to obtain a prompt decision in

*Main I*. We consider the "core" of our *Main I* decision the conclusion that Arch has a legitimate claim in some amount, providing it with standing to maintain the Proceedings, but that its allowable claim must be fixed at a fraction of its $3 million state court judgments.

2. We discuss the reasons for our refusal to allow the appendage of the § 727(a)(4) claim to the Complaints in more detail at pages 85–86 *infra*.

security deposit of $6,416 from the claim of Arch in *Main I*, 207 B.R. at 837. This decision was reversed in *Blatstein I*, slip op. at 32–33. At the conclusion of the trial, we accorded the parties very long periods in which to file post-trial submissions: the Plaintiffs, an opening submission by June 27, 1997; the Defendants a reply by August 1, 1997; and the Plaintiffs a sur-reply by August 8, 1997.

The hearing on Main's objection to Lift's proof of claim ("the Lift Objection") was conducted on June 11, 1997. We issued an order that same day requiring the parties interested in the Lift Objections to brief their respective positions on this issue in conjunction with their post-trial submissions relevant to the Proceedings.

On June 27, 1997, the Plaintiffs filed a 133–page post-trial Memorandum of Law Including Findings of Fact and Conclusions of Law. Despite our refusal to allow an extension, the Defendants filed their joint Proposed Findings of Fact and Conclusions of Law, totalling 163 pages, five days late, on August 6, 1997. The Plaintiffs filed a relative short (17 pages) Reply Memorandum, also five days late, on August 13, 1997.

The facts adduced by the record are as follows. All of the corporate Defendants are Pennsylvania corporations jointly owned by Blatstein and Lori ("the Blatsteins"), the sole shareholders as tenants by the entireties. Several other corporations not named as defendants in the Proceedings but which are also owned by the Blatsteins and are relevant to the matters at issue include Chicken Fingers, Inc. ("CFI"), a non-operating entity the New Jersey bank account of which was utilized by Philly Rock just prior to the takeover of that business by Columbusco; and Cobalt, Inc. ("Cobalt"), which was incorporated on February 27, 1997, and, after funding from Lift, is operating a separate new nightclub.

Prior to July 1996, Blatstein was the chief executive officer ("CEO") and president of all of the corporate Defendants. He remains as president and CEO of all of the corporate defendants except Main, of which Lift became president as of July 1996 after "foreclosing" on the assets and stock of Main on

July 25, 1996. Blatstein has final decision-making power and is the sole individual with check writing authority for all of the corporations in issue, including Main, the latter of which all of the defense witnesses agree Lift allowed him to continue to "run" after the "foreclosure" by Lift. The employees of all of these corporations act under Blatstein's direction. The Blatsteins also previously owned several predecessor corporations which no longer operate. In addition to Archco, which owned and operated the Phoenix nightclub, these entitles included Walnut Federal, Inc. ("Walnut"), which operated a restaurant; and Boulevardco, Inc. ("Boulevardco"), which formerly operated the Tailgaters Sports Bar.

Lift has been the accountant of Blatstein and, before him, his father, who apparently owned and operated a series of similar establishments, since 1948. Over the years, Lift has made loans to the Blatsteins and/or their corporations, accepting periodic repayments through various unwritten arrangements. Lift testified that, upon the advice of his son, who had recently graduated from law school, he first filed financing statements to secure his claims with the Commonwealth of Pennsylvania in 1992. We note that this filing of "protective" security documents commenced almost simultaneously with Arch's litigation against Archco. In this regard, Lift filed financing statements referencing virtually all of the assets of Main, *i.e.*, its liquor license, furniture, equipment, trade fixtures, fixtures, inventory, cash and non-cash proceeds of the assets on May 28, 1992, and on November 12, 1992. He also filed financing statements on April 15, 1996, against the collateral of Delawareco pursuant to a $380,000 security agreement dated March 21, 1997, and against Engine 46 pursuant to a $380,000 security agreement dated March 2, 1997. Finally, he most recently filed a financing statement on April 17, 1997, against Airbev's assets.

In addition, Lift obtained two confessed judgments against Main on May 28, 1992, after Main purportedly defaulted on loan repayments to him. One of the confessed judgments was for $43,229.50, based on an October 14, 1991, judgment note of $50,000. The other was for $174,443.30, and was based

upon a judgment note dated February 15, 1992, for $140,000. The largest of the confessed judgments was obtained on November 12, 1992, against Main for $481,411.30 and was based upon a $500,000 judgment note executed by Main which is dated January 31, 1989, which the Plaintiffs pointed out is prior to the incorporation of Main and about two years before Philly Rock, the operation of which was its sole activity, opened for business. Finally, Lift obtained a judgment note for $112,000 against Main on February 4, 1993.

Lift also obtained confessed judgments against, and held judgment notes executed by, other Blatstein-owned corporations. He obtained a confessed judgment against Delawareco on November 12, 1992, in the amount of $224,152.08 based upon a $150,000 judgment note dated August 1, 1992. Airbev also executed judgment notes in his favor on March 4, 1997, specifically a $500,000 note and a security agreement and stock pledge agreement. Delawareco also gave Lift an October 1, 1993, judgment note for $200,000; and a February 4, 1993, judgment note for $65,000.

As noted in *Main I,* 207 B.R. at 835, Arch obtained a confessed judgment in state court against Blatstein on November 12, 1992, in the amount of $2,774,803.09, for breach of a commercial lease entered into between him, on behalf of Archco, and Arch for past and future rent due for the premises where Archco previously operated the Phoenix nightclub. This judgment reflected rent due from the date of the breach, April 1992, to the end of the lease in 2003. *Id.* at 836. Blatstein attempted to open the judgment, was unsuccessful, and appealed to the Pennsylvania Superior Court which, on August 31, 1993, affirmed. He did not seek further review of this decision.

As we also noted in *Main I,* at *id.,* Arch attempted to execute on its confessed judgment against Archco by serving writs of execution and interrogatories in aid of execution upon all of the entities owned and operated by Blatstein in November 1992. Main never responded to the interrogatories and never appeared at a scheduled assessment of damages hearing. *Id.* As a result, the state court entered a default judgment against Main in November 1993 for the full amount of the judgment against Blatstein. *Id.* Shortly after the garnishment of $56,228.51 from Main's bank account in February 1996, Main filed a petition to open the judgment and stay execution, but the petition was denied. On Main's appeal to the Superior Court, the decision was affirmed, with the proviso that "the right of [Arch] . . . to execute against assets in the hands of Main, Inc. is limited to those assets owed to, owned, or controlled by Eric J. Blatstein." *See 718 Arch Street Associates,* No 1849, slip op. at 5–6, 698 A.2d 117 (Pa.Super. January 14, 1997).

The other corporate defendants also refused to respond to document production requests filed by Arch, and were allegedly held in contempt of court and sanctioned in some manner not fully reflected in this record. Arch alleges that the corporate defendants' obstruction of its collection efforts made it unable to "ascertain the full extent of the Defendants' fraudulent practices." *See* Complaint of Plaintiff/Creditor 718 Arch Street Associates, Ltd., against Blatstein ("the Complaint"). (both Complaints are almost identical), at ¶ 33. We note, however, that none of the corporate defendants executed any guarantees reflecting any obligation which they owed to Arch, nor were they ever tenants of Arch. We also note that, on November 12, 1992, the very day that Lift obtained its confessed judgment against Main, Lift filed a UCC financing statement against the assets of Main and also obtained a confessed judgment against Main for $481,411.30 based upon a $500,000 judgment note executed on January 31, 1989.

Lift obtained the participation of other friends and associates of his in advancing funds to Blatstein and his corporate entities, notably Gayle and Harold Beratan ("the Beratans") and Ed Brotsky and Fred Silver (referenced as "Ed and Fred"). The Beratan loans were made in two forms: (1) by checks made payable to various of the corporate defendants or to third parties allegedly acting on the Debtors' behalfs; (2) by the purchase of a loan from Marian State Bank ("Marion") which was allegedly made to Lift

on Main's behalf. The loans of Ed and Fred were purportedly made to Engine 46 and Reedco, respectively. There is no evidence of repayment of these loans in the form of corporate checks or receipts, although they were allegedly repaid in cash from accounts of Main, Columbusco, and Engine 46.

The Plaintiffs assert in the Complaint that "the stock and assets of the debtor-related entities belong solely to Blatstein, are part of Blatstein's bankruptcy estate, and are available to satisfy Blatstein's obligations to the Plaintiff." *Id.* at ¶ 40. They base this allegation on the fact that they believe that Lori did not give any consideration in return for her stock in the corporate defendants, *id.* at ¶ 37, as well as their belief that the individual and corporate defendants "have attempted to render Blatstein judgment-proof and defraud [it] . . . by, *inter alia,* forming the debtor-related entitles and titling the stock in the names of Blatstein and his wife as tenants by the entireties." *Id.* at ¶ 35. Further, they allege that, "in his operation of the debtor-related entities, Blatstein fails to adhere to corporate formalities, substantially intermingles the debtor-related entities' affairs with his own personal affairs, and uses their assets to further his own personal interests. In essence, the debtor-related entities are alleged to be a mere facade for Blatstein's operations." *Id.* at ¶ 38. The Plaintiffs conclude that "Blatstein's abuse of the corporate form of the debtor-related entities makes it clear that they are, in fact, alter-egos of Blatstein, and requires piercing their respective corporate veils." *Id.* at ¶ 39.

In further support of their contentions as to Lori, the Plaintiffs allege that Lori does not actually have any ownership interest in any of the stock of the corporate defendants, but that in fact the stock is owned solely by Blatstein. They contend that this is evidenced by Blatstein's purported failure to inform the corporate defendants' creditors of Lori's co-ownership and by the fact that Blatstein was listed as the sole owner of many of these entities in their federal tax returns. They also point out that, when the corporate Defendants applied to Transmedia Network, Inc. for credit in 1995 and 1996, Blatstein was designated on the application forms as the sole owner of the corporations. The Plaintiffs contend that, by designating himself as the sole shareholder to his creditors, Blatstein prevented Lori or their entireties entity from being obligated on any debts incurred by the corporate Defendants. *Id.* at ¶¶ 41–43.

The Plaintiffs also contend that the numerous purported loans from Lift to several of the corporate defendants were fraudulent, sham loans utilized by the parties to "further insulate the debtor-related entities from Blatstein's creditors." *Id.* at ¶ 44. In this regard, they state that the various notes and UCC financing statements were executed in favor of Lift on behalf of the debtor-entities at times when little or no consideration was given by Lift. *Id.* at ¶ 45. They assert that, in some cases, even before the entities opened for business, they intentionally "defaulted" on their obligations to allow Lift to obtain judgments and thereby establish Lift's priority over any less-friendly subsequent creditors, thus effectively rendering the entities judgment-proof and preventing creditors like Arch from reaching their assets. *Id.* at ¶¶ 46, 47. It is further alleged that Lift effected no *bona fide* execution on his judgments, but allows Blatstein to use the secured property on which he foreclosed. *Id.* at ¶¶ 48 to 50.

The Plaintiffs maintain that further proof of Blatstein's attempts to make and keep himself judgment proof and to keep Arch from collecting on its judgment against him are that Blatstein (1) does not put any assets in his own name; (2) uses the assets of the corporate entities to pay his personal expenses; (3) siphoned money from the corporate entities in the form of "loans" to himself and to Lori; (4) uses Waterfront to operate all of the corporate entities as one single enterprise for the benefit of himself and Lori; (5) did not give any consideration for the various loans and payment of his personal expenses by the corporate entities; (6) maintains a life of luxury despite the fact that he does not have any bank accounts in his own name; (7) transfers money and assets between the corporate entities so as to impair Arch's efforts to collect on its judgment; (8) intermingles the assets of the cor-

porate entities; (9) permits the corporate entities to assume each other's obligations, indicating that they are alter egos, not only of Blatstein, but also of each other; (10) permits the corporate entities to pay for services received by other entities; and (11) regularly assigns the accounts receivable of one corporate entity to other such entities. *Id.* at ¶¶ 52 to 74.

Although the Complaints do not reference same except in most general terms, the Plaintiffs also assert that Blatstein has improperly transferred all of his considerable income of greater than $1 million annually to Lori. Only Lori maintains a bank account and considerable evidence was presented relative to an investment account with Gruntal and Company which Lori maintained in her own name ("the Gruntal Account"), although $2 million of Blatstein's funds were deposited therein.

The Defendants called George Miller as their expert accountant at trial. Miller has a very broad and significant experience in numerous bankruptcy cases in this jurisdiction, usually in the employ of trustees. He proved to be very knowledgeable about the subject matter and well versed on the issues at hand in this case. Miller was, however, occasionally over-aggressive in defending himself from what he claimed were distortions of the facts introduced by the Plaintiffs' counsel.

The Plaintiffs also called a knowledgeable expert accountant, Harvey Grossman. While Grossman clearly could not equal the specialized experience of Miller in terms of working with bankrupt debtors and testifying in bankruptcy cases, he also presented himself as a knowledgeable, competent, and credible witness for the Plaintiffs. As might be expected, Grossman testified that his analyses of the transactions supported the Plaintiffs' claims that Blatstein's level of control and self-dealing with the various corporate Defendants were extraordinary and justified relief under the Plaintiffs' broad alter ego and fraudulent conveyance theories.

Miller, on the other hand, engaged in a series of reconstitutions of the financial records of the Defendants, each of which allegedly made the nature and volume of the transactions appear less objectionable. Mil-

ler's general thesis was that he has observed all or most of the practices at issue and found them acceptable business practices.

Both expert witnesses were credible. We found irritating rather than helpful the Defendants' attempts to blacken Grossman because a firm with which he had formerly practiced had previously filed bankruptcy. Given Miller's role as accountant for the trustees of many of the most notorious cases in this court, we credit Miller's testimony that he has observed many of the practices engaged in by Blatstein and Lift in other contexts. Less convincing was Miller's attempt to portray Lift's damaging admissions of his intention to serve Blatstein's interests in his testimony as gaffs attributable to incipient senility and his inferences that, since certain practices of Blatstein were utilized by other crafty debtors, they were proper.

The Plaintiffs did not call any independent witnesses of their own to testify at trial other than Grossman. Rather, they called Blatstein, Lori, Lift, and Kenneth Shoop, the controller of all of the Blatstein-owned corporations, as of cross-examination. The Defendants' only witness not called by the Plaintiffs in their case in chief was Miller.

Lori presented herself as a credible witness at trial. However, she is not a debtor and her role as a faithful spouse, homemaker, and occasional business partner were not really at issue. On the other hand, the more significant credibility of Shoop, Lift, and Blatstein was highly questionable as to numerous issues throughout the trial. For example, there were numerous instances in which each of them denied having any knowledge or memory of certain transactions and occurrences until they were confronted with their own prior inconsistent testimony taken at their depositions or some documentary evidence indicating their knowledge of the transactions and occurrences. Then, suddenly, they remembered. Thus, this court has found it necessary to discredit much of the self-serving aspects of this testimony, as we will note where relevant in our following discussion.

## C. DISCUSSION

1. *Blatstein's Prepetition Transfer of All of the Assets of Main to Other Entities of His Constituted "Actual" Fraudulent Conveyances Intended to Impede Arch from Executing on Its Judgments Against the Debtors.*

Although the Plaintiffs attempted to create a very full record in order to support a broad-based attack on the corporate structure of all of the Defendants, the Plaintiffs wisely initially focus their post-trial arguments on the relatively narrow contention that the transfers of Main's assets, *i.e.*, the successful Philly Rock restaurant, to other entities and finally *in toto* to Columbusco, were done with the actual intent to hinder, delay, and defraud Arch in its attempts to execute on its judgments obtained against the Debtors in state court. Specifically, the Plaintiffs aver that the accounts receivable of Philly Rock were transferred first to Reedco, then to CFI, then all of its assets were "purchased" by Lift at a "foreclosure" sale, and finally the assets were passed along to Columbusco for little or no consideration. The Defendants, again perhaps wisely, devote relatively little effort to defending against what is probably perceived by them as a lost cause, and much effort to preventing the Plaintiffs from succeeding in their broad alter ego claims which could be far more devastating to Blatstein's "empire" than the loss of only Philly Rock.

In their motion in limine and again in their post-trial submissions, the Defendants raise the statute of limitations issue to defend against transfers occurring more than two years prior to the Debtors' respective bankruptcy filings on September 20, 1996, and December 19, 1996. However, the transfers of the funds payable to, and other assets of, Main at issue did not commence until February 1996. These dates are well within the Pennsylvania two year statute of limitations for fraudulent conveyances. *See, e.g., In re Shields*, 148 B.R. 783, 786–87 (Bankr.E.D.Pa. 1993), and are clearly well within the one-year limitation period set forth in 11 U.S.C. § 548(a)(1). Also, we note that the Proceedings were instituted in January 1997, within one year from all of the transfers at issue.

The applicable Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa.C.S. §§ 5101, *et seq.* ("the UFTA"), provides, at 12 Pa.C.S. § 5104(a), that a transfer made by a debtor is fraudulent as to that debtor's creditors if the transfer was made either with the actual intent to delay, defraud or hinder the creditor(s), *cf. In re Fleet*, 89 B.R. 420, 427 (E.D.Pa.1988) (applying New Jersey Uniform Fraudulent Conveyance Act), or without receiving the reasonably equivalent value of the transferred property in exchange for the transfer when the transferor is insolvent. Similarly, the Plaintiff Trustees can succeed in their claims under 11 U.S.C. § 548(a)(1) by establishing that the Debtors transferred Main's assets with "actual intent to hinder, delay, or defraud" Main's creditors. *See In re Brantz*, 106 B.R. 62, 64–67 (Bankr.E.D.Pa. 1989).

The UFTA, at 12 Pa.C.S. § 5104(b), sets forth the following eleven factors which may be considered in determining whether the requisite actual intent to defraud was present when a transfer:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

■ These factors are similar to and overlap with most of the eleven "badges of fraud" which the courts have considered in determining whether a debtor possessed the requisite intent to hinder, delay, or defraud a creditor by transferring the property in several scenarios under the Bankruptcy Code, notably in interpreting § 548(a)(1), *see In re Lease–A–Fleet, Inc.,* 155 B.R. 666, 674 (Bankr.E.D.Pa.1993); and *Brantz, supra,* 106 B.R. at 67; and in interpreting 11 U.S.C. § 727(a)(2). *See In re Ishkhanian,* 210 B.R. 944, 951–53 (Bankr.E.D.Pa.1997); and *In re Cohen,* 142 B.R. 720, 728 (Bankr.E.D.Pa. 1992). These badges of fraud are as follows:

(1) lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention or possession, benefit or use of the property in question, although title exists in another entity;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) conveyance of all of the debtor's property;

(6) secrecy of the conveyance;

(7) existence of a trust or trust relationship between the debtor and the person to whom the property was conveyed;

(8) the existence or cumulative effect of a pattern of series of transactions or a course of conduct after the incurring debt, onset of financial difficulties, or pendency or threat of suit by creditors;

(9) the instrument affecting the transfer suspiciously states it is in fact bona fide;

(10) the debtor makes a voluntary gift to a family member; and

(11) the general chronology of events and transactions under inquiry.

■ We have noted that the most significant of these "badges" are numbers (1) and (4). *Ishkhanian, supra,* at 952–53; and *Cohen, supra,* 142 B.R. at 729. We also note that "badges" (1) and (4) are incorporated in 12 Pa.C.S. §§ 5104(b)(8) and (9), respectively. Most of the § 5104(b) factors are reflected in other "badges." *Compare* 12 Pa.C.S. § 5401(b)(1) with "badges" (2), (7), and (10); 12 Pa.C.S. § 5104(b)(2) with "badge" (3); 12 Pa.C.S. § § 104(b)(4) with "badge" (11); 12 Pa.C.S. §§ 5104(b)(5), (b)(6), (b)(7) with "badge" (5); and 12 Pa.C.S. § 5104(b)(10) with "badge" (11).

The responses of the Defendants to the Plaintiffs' actual fraud claims appear to be as follows: (1) the transfers, at least as to that aspect involving Lift, was in furtherance of enforcement of security interests, citing 12 Pa.C.S. § 5108(e)(2); (2) the transfers were necessary to preserve the operations of Philly Rock, for the benefit of all of its creditors, citing *In re Miller,* 39 F.3d 301, 306–07 (11th Cir.1994); and *In re Burgess,* 955 F.2d 134, 138 (1st Cir.1992); and (3) the Plaintiffs' expert Miller claimed that such transactions were not unusual in his experience.

■ The first defense requires us to render our assessment of the status of Lift and the foreclosure which he purportedly effected upon Philly Rock's assets. Clearly, Lift's secured status, even if legitimate, does not insulate the Defendants from a claim of a fraudulent conveyance if the foreclosure transaction is found to be collusive. *See Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206 (3d Cir.1990) (sham foreclosure set aside); and *Brantz, supra,* 106 B.R. at 64–67 (sham mortgage to insider set aside).

Addressing the "foreclosure" sale first, we note that the assets of Main, the value of which as a whole were not established in the record but which it was established yielded gross receipts of about $3 million annually, were sold to Lift at a public auction on July 25, 1996, for the grand total of $1.00. No one except Lift appeared at the auction to bid on the property. After the auction, Lift transferred the furniture, equipment and inventory of Philly Rock, valued at $35,000 by Lift, as well as its liquor license, valued at $23,000

by Lift, to Columbusco. Lift then allegedly sold Main's general intangible assets and the name "Philly Rock" to Columbusco for $1,000.00. Main's liquor license was not sold or transferred. Lift alleges that he was owed over $100,000 as of the date of the foreclosure sale and that the sale, being for a price of $1.00, reduced his secured claim by only that $1.00 amount.

It should be noted that, while Columbusco only paid $1,000 Main for the purchase of the assets of and the name "Philly Rock," Columbusco is repaying loans received by Lift for the use of Blatstein from the Beratans despite the fact that Columbusco nor Main ever received any of these loan funds. This appears to indicate that some additional consideration has and is indirectly being paid to Main for the "Philly Rock" name. Columbusco also granted Airbev licensing rights to use the "Philly Rock" name for a bar Airbev owns and operates at the Philadelphia International Airport. Airbev did not pay any money to Columbusco for this license.

The Defendants argue that Main did not transfer anything of value to Columbusco because the furniture and equipment in question was the property of Lift in light of the security interest which he held on the property and his subsequent foreclosure on that property at the above auction sale. We note, however, that the Philly Rock assets were transferred to Columbusco's use on July 1, 1996, while the foreclosure sale to Lift did not occur until July 25, 1996. Therefore, there was a period of time during which Columbusco used these assets of Main before they were acquired by Lift.

The Plaintiffs counter that the transfer of Main's assets to Lift at the foreclosure sale held on July 25, 1996, was fraudulent because the foreclosure was collusive and a sham which was arranged to prevent Arch from executing on its judgments against the Debtors. They so argue because Lift only paid $1.00 for Main's assets, which were worth $35,000, even according to Lift and the other Defendants. Thus, it is clear in this case that Lift did not pay full consideration for Main's assets.

Pennsylvania law states, with regard to a secured creditor has a right to dispose of collateral after a default in payment. *See* 13 Pa.C.S. § 9504. In this case, Lift alleges that he has a valid secured lien on the Main assets, and therefore was entitled to force the sale of the assets. Furthermore, he avers that, since he was the only party present at the foreclosure sale, which was advertised in the Philadelphia Inquirer newspaper, his bid of $1.00 was sufficient to satisfy the statute. He does not explain why he proceeded to "give back" assets which he valued at $35,000 to Blatstein, in the name of Columbusco.

At trial, several exhibits were introduced which purported to show that Lift had valid liens against the assets of Main and others of the corporate defendants. These exhibits included UCC financing statements, judgment notes indicating that Lift loaned funds to Blatstein and to several of the corporations owned by him and Lori, and confessions of judgment entered in the Philadelphia Court of Common Pleas. The Defendants argue in their brief that transfers to enforce Article 9 UCC security interests are not included in the definition of fraudulent transfers, pursuant to 12 Pa.C.S.A. § 5108.

A foreclosure sale, even one which was non-collusive, could, at least at one time, be avoided under 11 U.S.C. § 548(a)(2) of the Bankruptcy Code. *See, e.g., In re Brasby*, 109 B.R. 113, 120–25 (Bankr.E.D.Pa.1990), *aff'd sub nom. Brasby v. Joseph C. Perry, Inc.*, 1992 WL 21362 (E.D.Pa.Jan.29, 1992); *In re Orsa Associates, Inc.*, 99 B.R. 609, 617 (Bankr.E.D.Pa.1989); and *In re Cole*, 81 B.R. 326, 329–31 (Bankr.E.D.Pa.1988). However, it must be recognized that, construing this statute, the United States Supreme Court has indicated that the phrase "reasonably equivalent value" does not mean "fair market value" nor "fair foreclosure price." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544–46, 114 S.Ct. 1757, 1764–66, 128 L.Ed.2d 556 (1994). *See In re O'Neill*, 204 B.R. 881, 886–87 (Bankr.E.D.Pa.1997). Thus, the Court, in *BFP*, concluded that "reasonably equivalent value" in the context of a foreclosure sale means "the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." 511 U.S. at 544, 114

S.Ct. at 1765. However, the Court allows that, when it is determined that a foreclosure sale is collusive, the bankruptcy trustee can attack that sale of assets under section 548(a)(1) of the Bankruptcy Code. *Id.*

■ The bill of sale issued by Barry S. Slosberg, Inc., ("Slosberg"), the auctioneer of Main's assets, indicates that Lift purchased all of the furniture, fixtures, equipment and rock & roll memorabilia of Philly Rock subject to his own secured interest and subject to the sheriff's levy filed on behalf of Arch. The auction was held at Slosberg's place of business at approximately 9:00 a.m. on July 25, 1996. As previously stated, the total price paid for all of these assets at the auction was but $1.00. The Plaintiffs urge us to find that this auction was a sham. We agree that these factors, among others, establish that the foreclosure sale of Main's assets held by Lift was a collusive sale, the ultimate effect of which was to prevent Arch from executing on its state court judgment and levy against Main's assets for several reasons.

First, Lift never foreclosed upon the assets of Main or any other Blatstein-related entity prior to July 1996, even when Main and these other corporations had defaulted on the loans that he made to them on numerous occasions prior to July 1996. This is evidenced by the fact that Lift had obtained confessed judgments against the corporations as far back as 1992. This collusive conduct of Lift and Blatstein in effecting the sale when they did resulted in injury to Arch because it apparently prevented Arch from executing on Main's assets.

Second, while Main took every step conceivable to keep Arch from levying on its assets, it made no efforts whatsoever to prevent Lift, whom we find at pages 81–82 *infra* was an insider of Main, from foreclosing on those same assets. Moreover, when confronted with information regarding the timing of his obtaining the confessions of judgment against Main, Lift testified that it had nothing to do with Arch's shutting down of the Phoenix nightclub. He claimed that at the time he filed his confessions of judgment, he knew nothing about Arch's possible rights to the property. He further declared that he did not find out about Arch's claims until Main's bank accounts were garnished in February 1996. We find that Lift's claims of innocence are not credible. We do not think it is a mere coincidence that Lift filed his UCC financing statement and obtained a confession of judgment against Main on the same day that Arch obtained its confessed judgment. This is yet additional proof of the collusive and sham nature of Lift's actions as they relate to the debts he was allegedly owed by Main.

■ As to Lift's status generally, we conclude that his indicated fifty-year relationship with the Blatstein family as a trusted professional and source of cash; the continuation of his relationship by financing Blatstein's most recent Cobalt enterprise; Lift's assumption of the presidency of Main, rendering him currently a *per se* insider of Main, *see* 11 U.S.C. §§ 101(31)(B)(i), (ii); his convenient willingness to attempt to enforce his rights whenever Arch was prepared to proceed against the Debtors; and his prompt retransfer of all of the "essential assets" of Philly Rock to Blatstein, per Columbusco, which is a factor favoring fraud pursuant to 12 Pa. C.S. § 5104(b)(11), add up to Lift's status being properly classified as that of an "insider" of both Main and Blatstein at all pertinent times. .

■ We recognize that, prior to his assumption of the presidency of Main, Lift did not meet any of the *per se* insider criteria of 11 U.S.C. § 101(31)(B). Nor does or did he meet the *per se* insider criterion of 11 U.S.C. § 101(31)(A) as to Blatstein. However, the "insider" definition must be flexibly applied " 'to include a broad range of parties who have a close relationship with the Debtor.' " *In re Ingleside Associates,* 136 B.R. 955, 961, quoting *Orsa Associates, supra,* 99 B.R. at 621, citing in turn *In re Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 209–11 (5th Cir.1983); and *In re Acme–Dunham, Inc.,* 50 B.R. 734, 739 (D.Me.1985). A friendly creditor may be an insider of a debtor. *See, e.g., In re Holly Knoll Partnership,* 167 B.R. 381, 385–88 (Bankr.E.D.Pa. 1994); and *In re Papercraft Corp.,* 165 B.R. 980, 987–89 (Bankr.W.D.Pa.1994). We would

therefore classify a creditor whose relationship is that of a very close friend of the family who provides funds whenever they are needed as akin to that of a "relative" in the definition of "insider" appearing in 11 U.S.C. §§ 101(31)(A)(i), (B)(vi). This classification is particularly appropriate when the party at issue is so friendly as to be, as Lift was here, a willing accomplice to a fraudulent conveyance.

The *Miller* and *Burgess* cases cited by the Defendants in their defense to, mostly, the related § 727(a)(2) claims, *see* page 85 *infra*, were both § 727(a)(2)(A) cases in which Courts of Appeals refused to reverse bankruptcy court findings that certain transactions with creditors were not fraud because they involved transactions with creditors calculated to keep the debtors' businesses intact. However, both involved transactions quite distinct from the instant transactions whereby all assets of the transferring entity, *i.e.*, Main's transfer of its sole asset, Philly Rock, was at issue. It is hard to see how the transfer of all Main's assets to Columbusco can be said to have "preserved" Main's assets for any party's benefit except for the benefit of the Blatsteins and Lift. *Miller*, moreover, involved an arms' length sale of property at a slightly depressed price to a non-insider, bona fide secured creditor. 39 F.3d at 306–07. *Burgess* involved a transfer of merely certain unquantified proceeds of accounts receivable from a certain account to an insider, in order to make payroll. 955 F.2d at 138.

Finally, we reiterate that the Defendants expert Miller's experiences with debtors of questionable moral and legal standards, which may have jaded his perceptions, does not insulate Blatstein from liability. The fact that unnamed other parties have "gotten away" with conduct which is illegal is no defense to a violation of the law by the party who is "caught." Were it otherwise, the law would never be enforced in even those instances where its violation is detected.

▮ In assessing Main's 1996 transfers, it must also be recalled that the collusive foreclosure sale to Lift was not the only or the first strategy employed by Blatstein to prevent Arch from enforcing its judgment against Main after its February 1996 garnishment. Shoop testified that the course of events leading to Philly Rock's transfer from Main began when Jefferson Bank ("Jefferson"), where Main had its accounts, contacted him in February 1996 to advise him that Arch had garnished Main's bank accounts. In response, Blatstein ordered him not to put any more of Main's money into its Jefferson accounts. Rather, Blatstein instructed Shoop to put all of Main's accounts receivable into the Jefferson accounts of Reedco, which was incorporated in December 1995 but was not yet operating, in order to prevent Arch from attaching any more of Main's funds. Additionally, Shoop, on Blatstein's instructions, advised American Express, MasterCard, Visa, and Transmedia Network, Inc. to put the monies they owed to Philly Rock into Reedco's bank accounts instead of Main's accounts, as they had previously done. In fact, the only money deposited or taken out of Reedco's accounts during that time period was that of Main, since Reedco was not yet operating. Moreover, Shoop testified, as did Blatstein, that Main's money was diverted into the Reedco accounts so that Main could pay its bills; Philly Rock, operated by Main, could continue operating; and to circumvent Arch's garnishment of its bank account. The first deposit of Main's money into Reedco's accounts was made on February 23, 1996, one week after Arch garnished Main's bank accounts. Notations on Reedco's bank accounts made by Shoop and printouts of Main's general ledgers show that Main's accounts were indeed so diverted.

On April 16, 1996, the Sheriff of Philadelphia County, at Arch's directive, placed a levy on Main's furniture, equipment, liquor license and the entire contents of Philly Rock. Shoop found out about the levy one or two days after it was served. He testified that Blatstein told him to ignore the levy. Thereafter, Blatstein instructed Shoop to open a bank account for the deposit of Philly Rock's accounts receivable at Community Bank in New Jersey in the name of yet another corporation, CFI. The first deposit into this account was made on June 11, 1996. All of the accounts receivable of Main were deposited into this new account until the last deposit on September 18, 1996, just two days

before Main filed bankruptcy. CFI never conducted any business and did not have any other function except to hold the funds of Main. In fact, Blatstein himself testified at trial that "Chicken Fingers was Main, Inc."

Shoop also testified that Blatstein told him that Main was bankrupt and that he planned to transfer the ownership of Philly Rock to Columbusco. Exactly such a transfer of ownership became effective July 1, 1996. After this date Columbusco owned and operated Philly Rock and received all of the proceeds from its operation. All of Main's assets and employees were transferred to Columbusco. Philly Rock never shut down for one minute and still operates under the aegis of Columbusco with the same employees, furniture, and equipment as it did when it was owned and operated by Main. Blatstein, during his testimony, credibly stated that his sole reason for forming Columbusco was for it to take over the ownership and operation of Philly Rock from Main, in order to avoid Arch's claims against Main.

It is clear that Blatstein has at all times been in control of all of the corporate defendants' management and operations, noting that he is the president and CEO of all of the corporate entities except Main, and that he is the only person with check writing authority for all of the corporations. Moreover, Blatstein himself testified at trial that, when he gave Shoop the order, after the bank accounts were garnished, to deposit all funds of Main into accounts of Reedco, and later into CFI's bank accounts, he did so in order to keep Philly Rock open, so that Main could pay its bills, *and* to keep Arch from obtaining the funds. To our ears, this testimony constitutes an admission on the part of Blatstein that his intentions were to hinder and/or delay Arch from executing on its judgment against Main. Blatstein's attempts to soften this admission of an actual fraudulent conveyance as justified is unavailing, as is Miller's attempt to trivialize this wrongdoing as a standard business practice. We note that, when a debtor admits that he acted with actual intent to hinder, delay, or defraud a creditor, "there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent." *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir.1986). Such an actual fraudulent intent is, for all practical purposes, admitted here.

However, assuming *arguendo* that this court was obliged to rely on "circumstantial" evidence of actual intent to fraudulently convey in order to sustain this claim, we note that nearly every one of the factors set forth in § 5104(b) and "badges of fraud" has been proven in reference to Blatstein's 1996 transfers of Main's assets. The transfers were made to other corporations of Blatstein and to Lift, who are insiders or close associates. Blatstein retained the full control, benefit, and use of Main's assets despite the transfers. Blatstein attempted to keep these transfers concealed or secret, at least from Arch, particularly when the CFI New Jersey account was admittedly chosen because it was out of state and believed to be harder for Arch to trace. The general chronology of events supports the conclusion of fraud: the transfers were made immediately after Blatstein became aware of Main's liability for a substantial debt by means of Arch's garnishment of Main's Jefferson account. The transfers included all or substantially all of Main's assets. The value given was nominal, clearly inadequate given the considerable income of about $3 million annually generated by Philly Rock. In light of Arch's judgment against it, the transfers rendered Main an insolvent, worthless shell. Finally, Main's essential assets were effectively transferred to lienor Lift who immediately re-transferred the assets to Columbusco, an insider of Blatstein and Main. Given this constellation of factors and "badges," we conclude, without hesitation, that, on the basis of this analysis of "circumstantial" factors, as well as admissions from, *inter alia,* Blatstein's own mouth, the Debtors' fraudulent conveyance of Main's assets must be set aside, and the property transferred restored to Main so that it can be administered by Trustee Miller.

2. *Blatstein's Central Role in the Actual Fraudulent Conveyance of Main's Assets to Other Entities Constitutes Grounds to Deny His Discharge.*

▇ The Plaintiffs have been permitted to assert claims against Blatstein under 11

U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(7), which read as follows:

(a) The court shall grant the debtor a discharge, unless —

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

. . .

(7) the debtor has committed any act specified in paragraph (2), (3), . . . of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case under this title or under the Bankruptcy Act, concerning an insider;

. . .

Our conclusion that Blatstein orchestrated the "actual" fraudulent conveyance of Main's assets to Reedco, CFI, Lift, and Columbusco, within one year of his bankruptcy filing in itself seals the fate of his discharge. Thus, our finding that the 1996 Main asset transfers were perpetuated with actual fraud mandates the conclusion that Blatstein, in connection with the Main case and as Main's insider, "with intent to hinder, delay, or defraud" Arch, "transferred . . . property of the debtor" Main within one year of the filing of the petition of Main, an entity which he controlled.

In defense, Blatstein reminds us of the principles which we recently articulated in *Ishkhanian, supra,* at 949–50, 951, that

all the sections of § 727(a) must be construed liberally in favor of debtors. *See, e.g., Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir.1993); *In re Blanchard,* 201 B.R. 108, 120 (Bankr.E.D.Pa.1996); *In re Staffieri,* 1994 WL 463978, at *2 (Bankr.E.D.Pa. Aug.23, 1994) ("*Staffieri I*"), *aff'd sub nom. Obermayer, Rebmann, Maxwell & Hippel v. Staffieri,* 1995 WL 339019 (E.D.Pa. June 5, 1995) ("*Staffieri II*"); and *In re Cohen,* 142 B.R. 720, 725–26 (Bankr.E.D.Pa.1992) . . . ("the courts have consistently construed objections to discharge strictly against the objector and in favor of the debtor"). A denial of discharge is an "extreme step" that is not to be taken lightly. *See, e.g., Rosen, supra,* 996 F.2d at 1531; and *Blanchard, supra,* 201 B.R. at 120.

. . .

. . . We note that a cause of action under § 727(a)(2) is difficult to sustain because it does require, *inter alia,* a showing of improper intent on the part of the debtor, as well as improper conduct. *See Blanchard, supra,* 201 B.R. at 120; *In re Cook,* 146 B.R. 934, 935–36 (Bankr.E.D.Pa.1992); and *In re Trinsey,* 114 B.R. 86, 90 (Bankr. E.D.Pa.1990). As stated by the court in *In re Vail,* 1 B.R. 132, 134 (Bankr.E.D.Pa. 1979), quoting *In re Seperis,* 454 F.2d 195 (3d Cir.1972); and *In re Pioch,* 235 F.2d 903 (3d Cir.1956), " '[t]o bar the bankrupt's discharge there must be an actual fraudulent intent on the part of the bankrupt to hinder, delay or defraud his creditors and constructive intent is not sufficient; the reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural. . . . ' " Thus, it is the intent of the Debtor that governs any determination of fraud under § 727(a)(2). . . .

However, proof of the offending conduct which would purport to prevent a debtor from obtaining discharge must now be shown by only the preponderance of the evidence standard, the same standard which applied to the Plaintiffs' fraudulent conveyance claims, rather than the harsher "clear and convincing evidence" standard. *See Grogan v. Garner,* 498 U.S. 279, 285–91, 111 S.Ct. 654, 658–

61, 112 L.Ed.2d 755 (1991); *Ishkhanian, supra,* at 950–51; and *In re Blanchard,* 201 B.R. 108, 114 (Bankr.E.D.Pa.1996). Therefore, the finding as to an actual fraudulent conveyance under 12 Pa.C.S. § 5104(a) and 11 U.S.C. § 548(a)(1) appears entitled to collateral effect under the principles set forth in *Grogan, supra,* 498 U.S. at 283–85, 111 S.Ct. at 657–59, and, as a result, conclusive.

As defenses to the Plaintiffs' §§ 727(a)(2)(A), (a)(7) claim, the Defendants attempt to briefly argue that Main's property was foreclosed upon by Lift, not transferred to Columbusco by Blatstein. However, we have already found that Lift's foreclosure was the product of fraudulent collusion between Blatstein and Lift. *See* pages 80–82 *supra.* As an additional defense they cite *Miller, supra;* and *Burgess, supra,* in their support. These cases are, however, distinguished from the instant facts in the course of our discussion at page 82 *supra.*

We recognize that § 727(a)(7), like all sections of § 727(a), may be invoked only in the narrow circumstances where the evidence clearly supports the conclusion that an individual debtor, as an insider of another debtor, engaged in conduct within the scope of §§ 727(a)(2) through (a)(6) within the year preceding the other debtor's bankruptcy filing. Although Lift rather than Blatstein is now the president of Main, the debtor whose assets were fraudulently transferred, this is of no significance. Lift and Blatstein both testified that Blatstein continues to control what is left of Main. Moreover, § 727(a)(7) applies as long as the individual *was* an insider of the offending debtor in another case *when* the offending conduct in question occurred. *See In re Krehl,* 86 F.3d 737, 741 (7th Cir.1996). It is evident that Blatstein was and remains the "consummate insider" of Main, as he remains the controlling shareholder, has always had sole check writing authority, was the corporate policy maker, and ran the day-to-day operations of the corporation. *See id.* at 742.

Despite our recognition of the narrow reach of § 727(a)(7), we have not hesitated to apply it where appropriate. *See In re Landes,* 201 B.R. 399 (Bankr.E.D.Pa.1996). The § 727(a)(7) issues presented in this case

are much easier than those presented in *Landes.* Not only have we already found the commission of acts which constitute grounds for denial of a discharge under § 727(a)(2)(A), *compare id.* at 407–10, but also there is no question that these acts occurred in 1996, within the same year as the filings by both Main and Blatstein were made. *Compare id.* at 407.

We therefore conclude, without hesitation, that Blatstein's bankruptcy discharge must be denied pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(7) on account of his orchestration of the actual fraudulent transfer of debtor Main's assets within one year of the bankruptcy filings by both him and Main. As a result of this conclusion, it is unnecessary that we resolve the issues of whether Blatstein could be denied a discharge on any other grounds. Other grounds have been argued by the Plaintiffs, including (1) § 727(a)(2)(A) arising from his legally fraudulent transfers to Lori; (2) § 727(a)(4), arising from grossly misleading information on his schedules; and (3) § 727(a)(3), arising from his alleged destruction of computerized information relating to his own financial records. Arch also pleaded a challenge of the dischargeability of its own particular debt under 11 U.S.C. § 523(a)(6), on the grounds that Blatstein's alleged series of fraudulent transfers and conspiracy to defraud creditors constituted "willful and malicious" conduct.

The first of the three alternative grounds on which Blatstein's discharge could be challenged appears to lack merit, in light of our finding that Blatstein's transfers to Lori's accounts did not constitute fraudulent conveyances. *See* pages 93–95 *infra.*

The § 727(a)(4) discharge challenge appears to have substantive merit, in light of Blatstein's gross misrepresentation of his income as $16,000 monthly, or less than $200,000 annually, on his Schedule I, when in fact his income from all sources exceeded $1 million in 1995, the year preceding his bankruptcy. *See In re Katz,* 203 B.R. 227, 232–34 (Bankr.E.D.Pa.1996); and *In re Freedman,* 1994 WL 455030, at *3–*4 (Bankr.E.D.Pa. August 19, 1994), *aff'd,* 1995 WL 118217

(E.D.Pa. March 9, 1995).[3] However, fortunately for Blatstein, we declined to consider this claim because it was not clearly raised in timely fashion. *See Ishkhanian, supra,* at 954–56 (discovery necessary to support discharge/dischargeability claims must be conducted prior to discharge deadlines); *In re Desiderio,* 209 B.R. 342, 344 (Bankr.E.D.Pa. 1997) (deadlines to file discharge complaints must be strictly construed); and *In re Segal,* 195 B.R. 325, 329–32 (Bankr.E.D.Pa.1996) (belated amendments to add entirely new claims to discharge/dischargeability complaints after the deadline to file claims will not be permitted).

Finally, we agree with the Defendants' observation that Arch appears to have abandoned its § 523(a)(6) claim by not mentioning it in its comprehensive post-trial submissions. *See In re Laramie Associates, Ltd.,* 1997 WL 67848, at *12 (Bankr.E.D.Pa. Feb. 12, 1997); *In re Kaplan,* 1995 WL 500599, at *13 n. 8 (Bankr.E.D.Pa. Aug. 22, 1995); *In re Cara Corp.,* 148 B.R. 760, 770 (Bankr.E.D.Pa. 1992); *In re Henderson,* 134 B.R. 147, 155 (Bankr.E.D.Pa.1991); *In re Lloyd Securities, Inc.,* 1992 WL 165962, at *6 (Bankr.E.D.Pa. July 10, 1992); and *In re Slawek,* 1990 WL 41877, at *7 (Bankr.E.D. Pa. April 6, 1990).

 Much of the trial time was consumed with the Plaintiffs' illustrations that the financial statements, books, and tax returns of the Defendant corporations were often inconsistent. For example, the 1994 tax returns of Main and Delawareco were inaccurate in that they only reported six months of income and certain of those corporations, while reporting their payroll expenses for the entire year. Moreover, there were also numerous instances of intercompany loans that were made from one corporate defendant to another for which no loan documents were drafted to indicate exactly how much money was loaned, when, or on what repayment terms.

The Plaintiffs argued that the lack of documentation for the corporate loans to each other or Blatstein and/or Lori, the lack of documentation for the Lift loans, the failure to keep or preserve any recorded information from which the Debtors' financial transactions could be ascertained, the back-dated Lift Notes, and the allegedly falsified stock certificates indicating Blatstein and Lori's joint ownership of all of the corporate defendants added up to a violation of § 727(a)(3) of the Bankruptcy Code. However, in response, the Defendants' expert Miller testified that it is not unusual for related corporations to loan one another money without having any written documentation evidencing the terms of the loans as long as the loans are documented on the books and records of the corporations. Miller also testified that the same principle applies to loans to officers and directors of corporations from the corporations. Thus, he opined that the lack of documentation for these alleged loans to Blatstein and Lori was not unusual nor necessary. Plaintiffs' expert Grossman did not testify to the contrary.

The Third Circuit Court of Appeal has established that, while a "debtor may justify his failure to keep records in some cases, a discharge may be granted only if the debtor presents an accurate and complete account of his financial affairs." *Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir.1992).

The Bankruptcy Code does not specifically state what constitutes a justification for failing to maintain adequate records. *Id.* at 1231. Rather, the Code merely requires that the trier of fact determine whether the debtor's actions are justified based on the facts and circumstances of the particular case. *Id.* In order for the Plaintiffs to have prevailed on their claims under § 727(a)(3), they were obliged to prove that Blatstein (1) failed to maintain and preserve adequate financial records; and (2) that this failure has made it impossible for it to determine the financial condition of the Debtors and their relevant business transactions. If they met that bur-

---

3. We must reiterate our disdain regarding the pervasive inaccuracies and misleading statements in the Schedules filed on behalf of both Debtors in this case. Lift admitted numerous inaccuracies in his Schedules which he attributed to the fact that he signed them in blank at the request of Main's counsel without reviewing them. Had such testimony been adduced in less self-serving fashion from a more credible witness, it would have supported severe sanctions against the Main's counsel. We note Blatstein's apparent attempt to not only mis-state his income but slide through the system as an anonymous *pro se* debtor. Such tactics will not elude careful trustees. *But see Katz, supra.*

den, the burden of proof would then have shifted to Blatstein to prove that his records sufficiently disclosed his income and expenses in order for him to obtain a discharge, or to prove justification for his lack of adequate record keeping. *Id.* at 1233–34.

In this case, the record established that voluminous financial records were kept for the Blatsteins and each corporation. While the accountants and other financial professionals that worked for the various corporations owned by the Blatsteins may not have done a perfect, or better than mediocre, job of keeping accurate financial books, their failure to do so did not render it impossible to determine the financial condition of the Blatsteins or their corporations. The fact that the financial records may not have been totally accurate reflects more on the performance of the professionals who keep the books and records of the corporations owned by the Blatsteins, than on the Blatsteins themselves. The Plaintiffs were unable to prove the specific allegations which they made in their Complaint to the effect that Blatstein or Lori destroyed specific computerized financial records of the Blatsteins. Much of the evidence presented by the Plaintiffs was gleaned from the Blatsteins' records themselves and thus it was hard to argue that these records were so deficient that their financial status of these entities could not be established. We therefore hold that the level of inaccuracies in Blatstein's personal financial records and those of the corporation was not sufficiently high as to support the denial of Blatstein's discharge under § 727(a)(3) of the Bankruptcy Code. Of course, having prevailed in their §§ 727(a)(2)(A), (a)(7) claim, the disposition of the alternative bases for denial of Blatstein's discharge or the dischargeability of Arch's specific debt are irrelevant. Main is not entitled to a discharge in any event as long as its case remains in Chapter 7. *See* 11 U.S.C. § 727(a)(1).

3. *The Plaintiffs Have Failed to Meet the Difficult Burden of Proving that All of the Corporate Defendants Are Alter Egos of Blatstein, the Blatsteins, or Each Other.*

The Plaintiffs also vigorously argue that all of the non-debtor corporate Defendants are the alter egos of Blatstein and/or the Blatsteins, and/or each other, and that, as a result, their corporate veils must be lifted and all of their assets administered in the Blatstein bankruptcy case. This contention is an ambitious undertaking and, if it were successful, the claims seeking to undo the fraudulent conveyances of Main's assets and deny Blatstein's discharge would be relatively insignificant. That is because success on the alter ego claims would sweep all of the assets of Main, Reedco, Columbusco, and all of the other non-debtor Defendants into one huge Blatstein estate.

Despite our observation that this claim effectively subsumes the other claims, the Plaintiffs nevertheless wisely argue this claim secondarily to their stronger fraudulent conveyance claims. Perhaps they hope that the strength of the fraudulent conveyance claims and the weakness of the defenses thereto will create momentum which will carry them along to a complete victory. However, the Plaintiffs (and our) discussion of this issue *after* the fraudulent conveyance and discharge issues, which would be rendered rather insignificant if they succeeded on this argument, portends the Plaintiffs' accurate perception of our inability to sustain this ambitious argument.

The Plaintiffs base their alter ego claims mainly on the following evidence: (1) the corporations' repayment of the loans taken out by Blatstein from Lift and the Beratans; (2) Blatstein's use of the corporate defendants' funds to repay his personal expenses; and (3) the failure of any of the corporate entities to document or to charge any interest on their purported loans to Blatstein, Lori, or the sister corporate entities.

We begin our alter ego analysis with the premise that a corporation is a legal entity which is ordinarily deemed to be separate and distinct from its officers, directors, and stockholders and must be upheld unless there are specific circumstances which call for an exception to this rule. *See Zubik v. Zubik,* 384 F.2d 267, 273 (3d Cir.1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19

L.Ed.2d 1291 (1968); *In re Nutri/System, Inc.*, 169 B.R. 854, 869 (Bankr.E.D.Pa.1994) (*"Nutri/System I"*), *aff'd sub nom. In re Nutri/System of Florida Associates*, 178 B.R. 645 (E.D.Pa.1995) (*"Nutri/System II"*); and *Ashley v. Ashley*, 482 Pa. 228, 237, 393 A.2d 637, 641 (1978). Consequently, the validity of a corporate entity cannot be lightly disregarded. *See DuSesoi v. United Refining Co.*, 540 F.Supp. 1260, 1266 (W.D.Pa.1982).

 The Pennsylvania Supreme Court, as well as federal courts sitting in Pennsylvania, has held that a corporate veil can be pierced only when the person in control of the corporation uses control of the corporation solely to further personal interests. *See Nutri/System I, supra*, 169 B.R. at 869; and *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 117, 360 A.2d 200, 207 (1976). Piercing of the corporate veil is therefore a narrow exception to the general rule of corporate autonomy. It has also been held that a corporate veil will be pierced only when either it is necessary to avoid injustice to another party, *see Nutri/System II, supra*, 178 B.R. at 653; *Nutri/System I, supra*, 169 B.R. at 869; and *Rinck v. Rinck*, 363 Pa.Super. 593, 597, 526 A.2d 1221, 1223 (1987); equity requires that the corporate veil be pierced to prevent an injustice, illegality or fraud; or recognizing the corporate entity would result in a violation of public policy or protect someone from liability for a crime. *See In re Rosco Investors, L.P.*, 1996 WL 107503, at *7 (Bankr. E.D.Pa. March 6, 1996); *Ashley, supra*, 482 Pa. at 237, 393 A.2d at 641; and *Village at Camelback v. Carr*, 371 Pa.Super. 452, 461, 538 A.2d 528, 533 (1988), *aff'd*, 524 Pa. 330, 572 A.2d 1 (1990). *See also Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F.Supp. 1054, 1059 (W.D.Pa.1990); and *Zubik, supra*, 384 F.2d at 273.

The Third Circuit Court of Appeals has held that

[t]he corporate veil is pierced only when "the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries." *Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F.Supp. 1054, 1058 (W.D.Pa.1990) (citing

*Zubik v. Zubik*, 384 F.2d 267 (3d Cir.1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968)). "In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting the facade for the operations of the dominant shareholder." *Id.* at 1057 (citing *Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.*, 727 F.2d 279 (3d Cir.1983)).

*Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1521 (3d Cir.1994), *aff'd*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Thus, an individual cannot be held personally liable for the obligations of a corporation unless a court determines that the corporation is the alter ego of that individual. *Id.* at 1520–23; and *Zubik, supra*, 384 F.2d at 270–74.

 Factors to consider in determining whether the corporate veil can be pierced include (1) a failure to observe the corporate formalities; (2) non-payment of corporate dividends; (3) insolvency of the debtor corporation at the time of a significant action or transaction; (4) siphoning of corporate funds by the dominant shareholder; (5) non-functioning of the other officers or directors of the corporation; (6) lack or absence of corporate records; (7) establishment that the corporation is merely a sham for the operations of the dominant stockholder(s); and (8) undercapitalization of the corporation. *Kaplan, supra*, 19 F.3d at 1521; *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir.1981); *Wheeling–Pittsburgh, supra*, 758 F.Supp. at 1059; *Nutri/System II, supra*, 178 B.R. at 654; and *Nutri/System I, supra*, 169 B.R. at 870. Proof of these factors must be by a preponderance of the evidence. *Zubik, supra*, 384 F.2d at 270 n. 2; and *Wheeling–Pittsburgh, supra*, 758 F.Supp. at 1058. The burden of proving that the corporate veil must be disregarded is on the party who attempts to negate the existence of the separate corporate entity. *Publicker, supra*, 603 F.2d at 1069; and *Wheeling–Pittsburgh, supra*, 758 F.Supp. at 1058.

■ Every disregard of corporate formalities or failure to maintain corporate records does not justify piercing the corporate veil. *Kaplan, supra,* 19 F.3d at 1521. This is particularly true in the case of family or closely-held corporations. *Zubik, supra,* 384 F.2d at 271 n. 4 (cites omitted). A piercing of the corporate veil is only available as a remedy "if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors. In short, the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes." *Kaplan, supra,* 19 F.3d at 1521. *See also Zubik, supra,* 384 F.2d at 270 n. 2. Thus, in order for a court to agree to pierce the corporate veil, the party asserting that claim has to show that an individual has complete control over a corporation's finances, policy, and business practices so as to perpetrate a fraud. *Nutri/System I, supra,* 169 B.R. at 869, 871. "Alter ego status cannot be inferred whenever a shareholder withdraws some monies from a corporation without formally declaring a dividend or executing a note even if one of the withdrawals is made while the corporation is insolvent. If it did, every payment to a stockholder during insolvency would justify piercing the corporate veil." *Kaplan, supra,* 19 F.3d at 1522.

At trial, Shoop testified that numerous personal expenses of the Blatsteins were paid by the various corporations, including expenses for a horse trainer hired by the Blatsteins, loan payments to Lift for money loaned to the Blatsteins for the purchase of their home, mortgage payments on the home, and payments of Blatstein's personal income tax debts owed to the Internal Revenue Service ("the IRS"). This testimony was confirmed by Blatstein and Lift during their trial testimony as well, and by numerous financial documents introduced into evidence. In addition, Gayle Beratan, a loan participant solicited by Lift, who purchased a loan obligation of the Blatsteins from Marian; Lift's own wife Ruth; and Lori appear on the payroll records of Waterfront although none of them except Lori, in a limited role, ever appear to have done any work for that corporation.

Lift loaned various sums of money to the Blatsteins. Blatstein testified that he had no choice but to go to Lift and his associates as a private source for loans to capitalize his restaurants and nightclubs because these types of businesses have bad reputations with banks. Unstated was the fact that Blatstein's apparent method of operation of abruptly closing operations of establishments run as separate corporations and then forming new corporations to run new businesses was probably known to lending institutions and rendered them reluctant to deal with him. Moreover, Blatstein observed that banks infrequently loan money without corporate collateral, and all of his assets were already encumbered. Finally, Blatstein stated that the banks would not loan money to him because he owed substantial sums to the IRS, which had liens on his accounts.

A breakdown of all of the privately-funded loans purportedly made to or on behalf of Blatstein, Lori and the Blatstein-owned entities, evidenced by canceled checks, are as follows:

FROM THE BERATANS

| | | |
|---|---|---|
| To Edward Taraskus (a previous attorney of the corporations) | — | $ 5,200 |
| To Engine 46 | — | $190,000 |
| To Lift | — | $ 40,000 |
| To Airbev | — | $500,000 |
| To Delawareco | — | $ 55,000 |
| TOTAL LOANS EVIDENCED BY CHECKS | | $790,200 |

FROM LIFT

| | | |
|---|---|---|
| To Reedco | — | $100,000 |
| To Blatstein | — | $ 93,500 |
| To Main | — | $ 10,000 |
| To "Cash" | — | $ 3,500 |
| To Marian | — | $ 13,189.01 |
| To Morris Stemacher (apparently a creditor) | — | $ 10,000 |
| To American Express | — | $ 7,169.85 |
| To Mike Miller (apparently a creditor) | — | $ 4,000 |
| To Edward Taraskus | — | $ 10,100 |
| To Airbev | — | $ 50,000 |
| To Delawareco | — | $137,300 |
| To Engine 46 | — | $ 92,000 |
| TOTAL LOANS EVIDENCED BY CHECKS | | $530,758.86 |

At trial, Lift testified that the checks he wrote to the Blatstein-owned corporations, and on behalf of Blatstein and the corpora-

tions, to third parties do not evidence all of the money he loaned to these persons. He maintained that this court must also include in its calculations the loan he obtain from Marian on Main's behalf, an account of which Marian took $44,503.07 worth of his certificates of deposit due to the default on the aforementioned loan, and the following amounts:

- $50,000 to the Blatsteins which they used as a downpayment to purchase their present residence
- $520,000 note for loans to old businesses that failed
- a $500,000 judgment note
- $150,000 for delinquent and current payroll taxes of Blatstein-owned corporations
- a $200,000 security agreement between Lift and Delawareco dated May 1989
- a $150,000 security agreement between Lift and Delawareco
- $98,000 on May 6, 1997 to cover bank overdrafts
- $50,000 in April 1997 to capitalize Cobalt over $300,000 to Engine 46
- $71,667.79 in 11/95 from the Beratans to Blatstein

The $50,000 loan to the Blatsteins for the downpayment on their residence appears on the books of Delawareco as a liability of that corporation, on which that corporation makes payments. However, Shoop testified that the amount of the loan payments are deducted from the money that Delawareco owes to Blatstein for payments allegedly made by Blatstein on debts of Delawareco. The same loan also appears to be on the books of Pier 53 as well, as was confirmed by Shoop at trial. Reference to this loan also appeared on the 1993 tax returns of Pier 53 and on the 1996 tax returns of Delawareco.

Loans from the corporate defendants to the Blatsteins include the $140,000 downpayment that Pier 53 made on the Blatstein residence, which was purchased in 1994. The monthly mortgage payments on this loan are made by Delawareco and Main. In addition, Delawareco and Columbusco made the payments on Blatstein's personal federal income tax liability. The Beratans were being

repaid with $1,000 per week payments from Main and its successor entities, *e.g.,* Reedco, CFI, and Columbusco. All money paid to Lift and the Beratans on Blatstein's behalf, as well as monies paid to his other creditors for his personal expenses, were charged against his loan accounts with each corporation.

Moreover, old loans made in the 1980's to the failed businesses, particularly Archco and Boulevardco, are now being paid by the corporations presently owned and operated by the Blatsteins. For instance, documentary evidence was introduced at trial indicating that Airbev was paying the debts of Archco and Boulevardco in 1996, and Columbusco was paying off old obligations of Boulevardco to the City of Philadelphia. Blatstein, for Main, signed a $520,000 note, dated January 1989, payable to Lift for these old loans of the failed businesses and allegedly told Lift at that time that he and Main would pay off the debts of the old corporations to him as a condition of his loans to the new corporations. However, Main was not incorporated until September 1989, indicating that the note was back-dated. Lift was to be paid $1,000 per week on this note, which payments have been made by various of the corporations.

Lift testified that he made Blatstein sign the $520,000 note before he would loan him any more money. Both Lift and Blatstein testified that the $520,000 was used to capitalize Main and get Philly Rock off the ground. Shoop testified that all loan payments made on behalf of Blatstein by any of the corporations were charged against Blatstein's loan accounts. Furthermore, Blatstein testified at trial that Lift and one of the Blatstein-owned corporations also loaned funds to Cobalt to start its new operations.

The Plaintiffs' expert Grossman extensively reviewed the comprehensive analysis of books and records of the Blatsteins and of the various corporate defendants' records put together by Arch. He noted numerous discrepancies in the figures represented on the corporate books. He testified that notes, pledges of collateral, and interest payments should have been executed and made with respect to the intercompany loans and the

corporate loans to the Blatsteins. Thus, he concluded that the manner in which Blatstein operated the corporations was not appropriate for independent, separate entities.

However, Grossman admitted that the corporate loans to the Blatsteins were declared on their joint personal income tax returns as income, and that the corporations took deductions on their tax returns for the amounts of money which they loaned to the Blatsteins. He also admitted that banks sometimes do insist that related corporations guarantee loans and other financial transactions to each other, as Jefferson did in this case with the Blatstein-related corporations by requiring them to cover each other's overdrafts, and that this was not an unusual practice.

Finally, Grossman testified that Main did not owe any money to Blatstein, but rather that Blatstein owed Main $402,000. He also confirmed that exhibits introduced at trial showed $269,000 paid collectively by the corporations for the Blatsteins' personal expenses and that $360,000 was paid by Blatstein on behalf of the corporations.

In response, the Defendants' expert Miller testified that no hindrance of the creditors was shown to have been contemplated by Blatstein. Moreover, since there were no transfers to the corporations from Blatstein, he could not have technically engaged in any fraudulent conveyance. With regard to Lift loans, Miller opined that it was not improper nor unusual for Lift to insist that payment of the old debts occur before he loaned any additional monies to new entities.

Miller also testified that transfers by the Debtors could not be considered as fraudulent conveyances if they were transfers from non-debtor corporations, such as Airbev or Columbusco, to the Debtors. He observed that the opposite is true, i.e., that transfers to insolvent debtors such as Blatstein benefitted his creditors. Also, he opined that in his experience, shareholders of closely-held corporations do not pay for their stock in corporations. In lieu of this, they usually pay related incorporation expenses and attorneys fees.

Additionally, Miller noted that it is not illegal nor improper for closely-held corpora-

tions to grant non-interest bearing loans to their officers, nor to pay the personal expenses of their officers, so long as these loans are documented on the books of the corporations. He testified that it is also not atypical for corporations to write checks to third parties to pay for the personal expenses of their officers if the money paid is properly accounted for as compensation to the officers.

Weighing this evidence, and noting that Miller convincingly responded to most or all of improprieties identified by Grossman, we conclude that the Plaintiffs did not present sufficient evidence to satisfy their considerable burden of proving that all of the Defendant corporate entities should be declared to be the alter egos of Blatstein.

Many of the factors noted at pages 57–58 supra which must be weighed in determining whether to uphold an alter ego claim are not in evidence. First, there was no proof that the various corporations owned and operated by the Blatsteins were in existence only to benefit their private concerns. Quite to the contrary, with the exception of Main, due to the loss of its assets due to Blatstein's fraudulent conveyances of its assets, the corporations are financially stable and successful businesses. Further, there was no proof that the Blatsteins abused the legal separation of the corporations for illegitimate purposes. Kaplan, supra, supports the conclusion that the mere fact that the Blatsteins took money out of the corporations without formal documentation of these "loans" does not indicate that the corporations are the alter ego of the shareholders such as would justify a piercing of their corporate veils.

In addition, corporate formalities were observed. Each corporation kept its own financial records, on the whole separately maintained, despite occasional errors in so doing by the accounting professionals. Each corporation had its own bank account. Further, while loans made to the Blatsteins were not documented with loan agreements, they were recorded on the books and records of the respective corporations from which they obtained the funds. It is well recognized that it is not illegal for a closely-held corporation to lend money to its shareholders as long as such loans are properly recorded. Conse-

quently, we hold that the corporate veils of the various corporate defendants, including Main, cannot be pierced to satisfy Arch's state court judgments.

The transfers by the corporate defendants were, except for the transfers of Main's assets which we already found fraudulent at pages 24–43 *supra,* not effected by insolvent entities. Miller's testimony establishes that no siphoning of funds to Blatstein occurred. Again, with the exception of the Main transfers found fraudulent, no injustices were worked upon creditors by the Blatsteins or any of the separate corporate entities. The corporations basically stand alone and operated successful, independent businesses. We agree with Miller that the alter ego factors which do appear—nonpayment of dividends and non-functioning officers—are typical of many small closely-held corporations and cannot, in and of themselves, support the broad relief sought by the Plaintiffs on their alter ego claim.

We also refuse to conclude that any of the corporate defendants could be declared to be the alter egos of the other corporate entities. To be sure, there were numerous intercompany transactions or "loans." For example, Airbev paid $150,000 of Delawareco's taxes; money was paid from Lori's Gruntal and Company investment account ("the Gruntal Account") to Engine 46 for payment of its taxes and the payments were recorded on Delawareco's books and not those of Engine 46; Main wrote checks to pay for Reedco's start-up expenses; and Engine 46 paid the start-up costs of Airbev.

Shoop testified that, similar to the "loans" made to Blatstein by the various corporations, when one of the corporations paid his personal expenses and when one company wrote a check to pay the expenses of another company, the money expended was billed as an intercompany loan. He testified that funds were never commingled. Rather, money was loaned from one corporation to another so that each corporation could pay its particular expenses. Shoop stated that one corporation never simply absorbed all of the bills of another corporation.

No interest was ever charged on these intercompany loans. The Blatsteins were also not charged interest on the "loans" given to them to pay their personal expenses. But, according to Miller, to charge interest would be unusual in such situations. No loan documents were ever executed for the intercompany and Blatstein loans, nor were any agreements regarding when the money would be repaid ever set out on paper. It is unclear just how much money Blatstein owes to Main on his loan account balance for monies advanced on his behalf in payment of his personal expenses. One exhibit introduced at trial showed a figure of $402,710.58, although the corporate books and records must be deemed of doubtful precise accuracy because of errors made by the accounting professionals.

Miller testified that all of the intercompany transactions were recorded and were reconciled by him. He found that all of the corporations maintained separate books, liquor licenses, and bank accounts, and that each filed separate tax returns. Further, Miller's review of the books and records of the various corporate defendants showed that $31,000,000 in gross revenues were earned by all of them collectively in 1996. Of this amount, only 3.89% or $1,216,000 involved intercompany disbursements. Thus, he concluded that the corporations were not alter egos of each other by application of his measuring stick that only when more than one-third to one-half of a corporation's transactions are intercompany transactions does it indicate that a particular corporation is the alter ego of another corporation.

Miller stated that both public and private corporations engage in intercompany transactions, and that the Securities Exchange Commission and IRS allow this with no penalty. He further stated that it is normal for inter-related, closely-held corporations to guarantee each other's loans and other financial transactions. Finally, he found no evidence of commingling of funds of the corporations which were held by Jefferson because no transfers of funds between accounts occurred.

The Plaintiffs assert that the fact that Blatstein used the funds of some of the corporate defendants to repay the old loans of

some of his now-defunct corporations and to repay the loans of some of the other continuing corporations support the conclusion that the corporate defendants are alter egos of each other. However, while the intercompany loans were not documented by loan agreements, they were generally recorded on the books and records of each corporation. Moreover, the mere fact that the corporations did not charge interest on the intercompany loans does not indicate that fraud had occurred, particularly since they are all closely-held corporations owned by the same persons. Finally, the fact that these related corporations guaranteed each other's debts with Jefferson is not a basis for piercing their corporate veils, since many banks require such guarantees from related, solvent entities before they will extend credit to or permit corporations to open accounts.

It is important to note that each of the corporations' funds were kept separate and apart at Jefferson. Each corporation had its own accounts. Even when engaging in fraudulent transactions, funds were not commingled, since no corporation's funds were ever transferred between bank accounts. For example, when Main's funds were illegally put into Reedco's account, Reedco was not yet operating and did not have any money of its own in the account titled to it. Similarly, when the funds of Main were put into the CFI accounts, only Main's funds were in these accounts. Hence, we conclude that corporate defendants are not alter egos of each other.

We therefore reject all of the Plaintiffs' ambitious alter ego claims.

4. *No Fraudulent Transfers Are Found to Have Occurred Between the Blatsteins Because We Find No Actual "Transfer" of Blatstein's Assets and Income to Lori.*

The Plaintiffs argue that Blatstein made fraudulent conveyances to Lori which can be avoided pursuant to 12 Pa.C.S. §§ 5104, 5105 and possibly 11 U.S.C. §§ 548(a)(1), (a)(2). In support of these claims, the Plaintiffs aver that Blatstein transferred ownership of his stock in the corporate defendants as well as all of his

other assets either to Lori or to their joint ownership as tenants by the entireties. They also note that Blatstein placed all or most of his considerable salary in bank accounts and the Gruntal Account held by Lori in her own name.

We begin discussion of this issue by observing that married persons typically own their property jointly as tenants by the entireties. Ownership of property which is titled in this manner therefore does not *per se* connote an intention by one of the spouses to defraud creditors. In fact, Pennsylvania law provides that when property is titled in the names of a husband and/or wife, without more, it is presumed that the property is owned by them as tenants by the entireties, even if the funds for the purchase of the property came from one spouse alone. *See In re Estate of Holmes,* 414 Pa. 403, 406, 200 A.2d 745, 747 (1964). This is true because it is the marital status of the parties and not the words used or omitted on a document signifying ownership which determines whether the property is owned as tenants by the entireties or not. *Id.* In order to overcome this presumption of entireties' ownership, a creditor must prove by clear and convincing evidence that, to the contrary, the husband and wife did not intend to create a tenancy by the entireties. *Id. See also Constitution Bank v. Olson,* 423 Pa.Super. 134, 620 A.2d 1146 (1993). Moreover, even when one spouse puts property in the other spouse's name without the knowledge of the other spouse, courts still deem the property to be owned as tenants by the entireties. *See Holmes, supra,* 414 Pa. at 407, 200 A.2d at 747.

Lori testified at trial that all of the brokerage and bank accounts of the Blatsteins are in her name alone, and have been for the past four years. As a result, Blatstein deposits his income from his various corporations into these accounts. She testified at trial that the Blatsteins agreed that all of their accounts would only be opened in her name because of Blatstein's financial problems resulting from the money he owes to the IRS and not due to Arch's judgment against him, although in a pre-trial deposition she allowed that the Arch judgment was

a factor as well. Moreover, she testified that banks would not permit Blatstein to open an account in his name because he had previously had accounts for which he bounced numerous checks. She further stated that it was difficult for even her to get an account in her name due to Blatstein's track record with the banks.

The money deposited into the Blatsteins' Gruntal Account between October 3, 1995, and February 1997 which again was opened in Lori's name alone, came from Blatstein's paychecks, Lori's modest paychecks, loans from Lift and the Beratans, and loans from the various corporations which the Blatsteins owned. Of the $500,000 that was deposited into the Gruntal Account on October 3, 1995, $480,000 came from Delawareco. The funds in the Gruntal Account were used to purchase items for the Blatsteins' residence; to pay their mortgage; to pay bills, predominantly tax liabilities, on behalf of the various corporate defendants; and to put aside funds for their children's college educations.

Blatstein claims that he does not owe any money to the various corporate defendants on loans given to him, because at the end of each year, he reported all of the loan monies as income on his income tax returns. He further testified that he and Lori did not pay for their 100 percent stock interests in the various corporations because the corporations were capitalized by loans from Lift.

At trial Lori testified that she did not know whether or not she was a shareholder of the corporate defendants. Blatstein, however, testified that Lori was a co-shareholder of all of the corporations from their inceptions. In fact, the articles of incorporation filed with the Pennsylvania Secretary of State when each corporation was incorporated do indicate that Lori is and always has been a co-shareholder of the corporations. Additionally, the stock certificates introduced at trial all indicated that both Blatsteins own the stock of the corporations jointly. The Plaintiffs insinuated at trial, but did not present any proof, that these stock certificates were fraudulent. This court thus finds that there was no transfer at all of the Blatsteins' ownership in the corporations within one year of his bankruptcy filing. Rather, this court finds that Lori was always a co-shareholder of the corporations from the dates of their respective incorporations.

With regard to placing the bank accounts and the Gruntal Account in Lori's name only, we also find insufficient proof that this was done to keep creditors such as Arch from attaching the accounts. According to both Lori's testimony, and Blatstein's testimony which we found to be credible on this issue, the accounts were opened in this manner for two reasons. First and foremost, Blatstein's credit and reputation with financial institutions was not good. Consequently, these institutions would not permit him to open up any accounts. Second, in placing his funds into the accounts titled only in Lori's name, Blatstein was trying to keep the funds from being seized or frozen by the IRS or other taxing authorities, pursuant to a tax lien, in light of the personal income taxes which he owed to the IRS. We note that taxes were paid from the Gruntal Account, and therefore no fraud on the IRS or other taxing authorities appears to have been effected. Finally, we note that, even had the funds been placed in joint accounts, as is typical of most married couples, Arch would have been unable to reach them because its judgment was only against Blatstein individually.

As to the Blatsteins' residence, documentary evidence and testimony presented at trial indicate that the Blatsteins own this property as tenants by the entireties. The property was so owned from the date that it was purchased, as was their previous residence. The Plaintiffs have not proven that any fraud was involved in the titling of this property, nor that the property was ever transferred from Blatstein to Lori or the entireties' entity. We find, quite to the contrary, that the property was originally titled in the names of both Blatsteins, and that this was done not to commit a fraud against any of Blatstein's creditors, but rather in conformity with the typical manner in which husbands and wives title jointly-owned residences.

Finally, we note that there is insufficient evidence to support a claim that any transfers of corporate funds to Lori were fraudulent. The amount owed by Lori to any of the corporations, or vice-versa, is unclear.

Checks from Airbev's accounts made out to Lori total $395,500. One corporation's balance sheets shows her owing it $109,000 in May 1996, while another exhibit dated June 1996 only shows a balance of $3,000. Yet another document shows a debt of Lori to Delawareco of $485,570. However, Miller testified that these figures are all incorrect and that the Blatsteins both owe either very little or nothing at all to the corporations.

■ As earlier stated, every withdrawal of funds from a closely-held corporation by a shareholder does not indicate fraud. The Plaintiffs have not proven any intention of Lori to defraud Arch in its efforts to execute on its judgments against the Debtors or any other creditors. The funds in question were recorded on the books and records of the various corporations from which Lori received the loan funds. Further, the Blatsteins accounted for this additional income on their federal and state income tax returns. Accordingly, we conclude that the monies withdrawn from the corporations by Lori were not fraudulent transfers.

We therefore refuse to conclude that any transfers to Lori from Blatstein, Main, or any other entities were fraudulent conveyances. Consequently, if we were obliged to address the issue of whether any such transfers from Blatstein could constitute a ground for denial of his discharge under 11 U.S.C. § 727(a)(2), we would be disinclined to so hold.

5. *Arch Has Not Proven that the Actions Taken Against It by the Defendants Amounted to a Conspiracy to Defraud It.*

■ Count Two of the Complaint pleaded a conspiracy of all of the Defendants to defraud Arch of the fruits of its judgment. Neither party appears to have discussed this claim in its post-trial submissions. Therefore, we could perhaps assume that, like the Plaintiffs' § 523(a)(6) claim, the Plaintiffs' conspiracy claims have been abandoned. *See* cases cited at page 50 *supra.* However, since this claim is prominently pleaded, we will, in an abundance of caution, briefly address its lack of merit and/or redundancy.

In order to prove a civil conspiracy, a plaintiff must show that two or more people combined to commit an unlawful or criminal act or to commit a lawful act by unlawful means or for an unlawful purpose. *Ammlung v. City of Chester,* 494 F.2d 811, 814 (3d Cir.1974); *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 211, 412 A.2d 466, 472 (1979); *Landau v. Western Pennsylvania Nat'l Bank,* 445 Pa. 217, 224, 282 A.2d 335, 339 (1971); and *Fife v. Great Atlantic & Pacific Tea Co.,* 356 Pa. 265, 266, 52 A.2d 24, 27 (1947). It is essential that a plaintiff prove malice, or intent to injure, in order to prove that a conspiracy has taken place. *Thompson Coal, supra,* 488 Pa. at 211, 412 A.2d at 472. The unlawful intent that a plaintiff is required to prove "must be absent justification." *Id.,* 488 Pa. at 211, 412 A.2d at 472. Thus, "[a] conspiracy becomes actionable when some overt act is done in pursuance of the common purpose or design held by the conspirators . . . and actual legal damage results." *Baker v. Rangos,* 229 Pa.Super. 333, 351, 324 A.2d 498, 506 (1974) (cites omitted).

Moreover, a "corporation cannot conspire with itself because a corporation can act only through its officers and employees. While conducting company business, they cannot conspire with the corporation of which they form an indispensable part. A corporate conspiracy also requires more than the collective judgment of two individuals within the same entity, for their conduct, if challenged, becomes that of the single, corporate entity." *Jagielski v. Package Machine Co.,* 489 F.Supp. 232, 233 (E.D.Pa.1980). *See also Chambers Development Co. v. Browning–Ferris Industries,* 590 F.Supp. 1528, 1541 (W.D.Pa.1984) ("a corporation and its employees are not capable of a civil conspiracy"); and *Quigley v. Exxon Co. U.S.A.,* 376 F.Supp. 342, 350 (M.D.Pa.1974).

The record of this case, large as it is, fails to contain any evidence that substantiates the Complaint's allegations that any two or more of the Defendants combined their efforts to transfer the property of Main to third parties with an intent to injure Arch, except perhaps Blatstein and Lift as to the actual fraudulent conveyances already found

actionable at pages 78–84 *supra.* Even in those actions, it could be argued that Blatstein's and Lift's primary concerns were keeping Main in business, not merely causing injury to Arch. However, finding a conspiracy adds little or nothing to our conclusion that a fraudulent conveyance of Main's assets occurred. There is insufficient proof that Blatstein and Lift acted with malice to injure Arch on a grander scale. Accordingly, we find no reason for holding that the Plaintiffs have proven an actionable conspiracy of any of the Defendants to defraud Arch.

6. *The Plaintiffs' Objection to Lift's Proof of Claim Must Be Sustained.*

On February 26, 1997, Lift filed a secured proof of claim in the amount of $492,415.41 in the Main bankruptcy case.[4] He testified at the June 11, 1997, hearing on the Objection that this figure is accurate if it is assumed that we can consider $62,000 in loans directly payable to the Beratans to be part of his debt, which Lift claimed is justified because he is responsible for their re-payment to the Beratans. The sums which Lift testified that he has advanced to Blatstein and the various entities owned by him over the years are set forth in the "alter ego" claim discussion at pages 89–90 *supra.* Of the funds loaned, Lift conceded that only the $100,000 check made payable to Reedco actually went into Main's accounts. He also testified that, of the $150,000 loan from Marian to him which was allegedly on Main's behalf, only $42,000 is now owed.

Lift admitted that he did not give any credit to Main in his proof of claim for the value of the assets of Main upon which he foreclosed. With regard to the loan documents with Marian executed by him, he admitted that there is no reference to Main but stated that this was because Main was not yet in existence at that time. However, he reiterated that the funds borrowed from Marian, though nominally on behalf of Boulevardco, were in fact used to capitalize Main. Furthermore, he alleged that Marian would

only take a security interest in property of a corporation already in existence and having assets, and that this is why the loan documents dated March 1989 and March 1991 refer not to Main, but to Boulevardco.

The Plaintiffs objected to Lift's proof of claim on several grounds, observing that the $500,000 judgment note dated January 31, 1989, was backdated, as was the corresponding security agreement, since Main was not incorporated until September 1989 and did not begin doing business as Philly Rock until 1991. They further claim that the documents are fraudulent since no such loan or consideration was or could have been given to Main by Lift on January 31, 1989. Moreover, the 1991 tax return of Main does not show any loan to it from Lift. Thus, the Plaintiffs conclude that the documents used to confess judgment against Main for $481,411.30 by Lift were shams which were constructed to further the collusive judgment and subsequent foreclosure of Main's assets by Lift. *See* pages 80–81 *supra.* Accordingly, the Plaintiffs aver that Main paid Lift in full on any debts owed by it to him. Furthermore, they argue that Lift's secured claim ended when he enforced the stock pledge agreement and acquired all of Main's stock in July 1996.

Lift presented a document at the hearing which stated that monies still owed to him by Main are as follows: (1) $261,000 on the loans to the old corporations; (2) $62,000 towards the Beratans' purchase of the loan from Marian; (3) $10,000 that the Beratans loaned to Main in August 1996; (4) $100,000 that he loaned to Reedco on Main's behalf in 1996; and (5) $43,000 which was taken from his certificates of deposit by Marian when Main defaulted on the old loans. These figures total $476,000 that Lift claims is still owed to him by Main, which is fairly close to the $492,415.41 originally claimed by him.

We recently stated, in *In re Bova,* 211 B.R. 803, 810–11 (Bankr.E.D.Pa.1997), that

---

**4.** No proof of claim was filed in the Blatstein case, possibly because it has been administered as a no-asset case pending the outcome of the Proceeding. Status hearings in both the Blatstein case and the Main case are also scheduled

in the accompanying Order so that we can set bar dates for filing claims in both of these cases and possibly deadlines for when the Trustees anticipate filing their Final Audit papers in these cases now that the Proceedings are decided.

[t]he relative burdens of proof of the parties to proof of claim litigation is [sic] set forth in *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir.1992), as follows:

> "If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. *See In re WHET, Inc.*, 33 B.R. 424, 437 (Bankr.D.Mass. 1983). The burden of persuasion is always on the claimant. *[In re] Holm,* 931 F.2d [620,] at 623 [ (9th Cir.1991) ], (quoting *Collier* § 502.02, at 502–02; *[In re] Windsor Communications [Group, Inc.]* 45 B.R. [770,] at 773 [ (Bankr.E.D.Pa.1985) ].)"

*See also In re Jordan,* 91 B.R. 673, 683 (Bankr.E.D.Pa.1988) ("once an objector raises an objection to a claim and provides any evidence tending to dispute a claim, the claimant will prevail only in an amount that it would be awarded at a trial or hearing, in which the burden of proving its case by a preponderance of the evidence [is] upon the claimant.' *[In re] Lewis, . . .* 80 B.R. [39,] at 41 [ (Bankr.E.D.Pa. 1987) ].")

We conclude, rather easily, that Lift has not proven the validity of any of his claims against the estate and that, even if he had, any such claims would be subject to equitable subordination to the claims of all other of Main's creditors.

We can easily dispense with the claims based upon alleged liabilities of Main arising from the Marian loan, the Beratan loans, and the certificates of deposit that were redeemed by Marian, since none of these monies were loaned to Main. There is no mention of Main in the loan documents from Marian. Moreover, in a letter from Marian sent to Lift regarding the redemption of the certificates of deposit, the bank officer stated that the monies therefrom were applied to the indebtedness of Archco, Boulevardco, and the Blatsteins individually, not to Main. Moreover, in a July 20, 1993, Assignment of Promissory Notes, Mortgage, Surety, Agreements, Security Agreements and Other Collateral executed between Marian and the

Blatsteins, it was specifically stated that the Marian loans assigned to the Beratans in the amount of $391,162.67 pertained to funds borrowed by Boulevardco, Archco, and the Blatsteins on behalf of Walnut. Nowhere in any of the documents evidencing these loans is Main mentioned. Moreover, we believe that the monies loaned by Marian were for the benefit of the now-defunct old corporations, not for Main's benefit as Lift testified. Therefore, we will not obligate Main's bankruptcy estate to reimburse Lift on those loans.

 Remaining is only the $100,000 loaned to Reedco in 1996 by Lift. We believe that the check made payable to Reedco in 1996 was actually money lent for the benefit of Main, particularly since, at the time that this loan was made, Reedco was not yet operating. We previously held that all of Main's proceeds were fraudulently deposited into the accounts of Reedco at the same time that Lift's loan to Reedco was made. *See* pages 82–83 *supra.*

However, the fact remains that Lift made the $100,000 loan to Reedco, not to Main. As we held in *In re Valley Forge Plaza Associates,* 1992 WL 96336, at *1, *2 (Bankr. E.D.Pa. April 28, 1992), a creditor cannot transform a loan made to third parties for the benefit of a debtor into a claim against a debtor's estate on third-party beneficiary, restitution, implied contract, or any other cognizable legal grounds. Moreover, the third party claim at issue in *Valley Forge Plaza* was on account of a loan made by an innocent, unrelated creditor-bank, not by an insider such as Lift who was, given his favored position, uniquely knowledgeable about the different entities involved and quite capable of ascertaining the financial status of Reedco, the party to whom he actually made the loan in question. The inability of Lift to shift the liability to Main is merely a fruit of the fraudulent conveyance of Main's assets, in which he was an active participant. *See* pages 79–81 *supra.*

 Were we to conclude that Lift was entitled to any claim, we would nevertheless be inclined to subordinate any such claim to those of not only Arch, but all other

"innocent" creditors of Main. As an insider of Main, *see* pages 81–82 *supra,* Lift's claim is subject to careful scrutiny. *See In re Lani Bird, Inc.,* 129 B.R. 203, 206 (Bankr.D.Hawai'i 1991); and *In re Comtec Industries, Inc.,* 91 B.R. 344, 347–49 (Bankr.E.D.Pa. 1988). The instant claim cannot withstand even normal scrutiny.

 Further, while an insider's claim is not, because of the insider's status, subject to subordination, subordination is appropriate when it is proven that

> the creditor had engaged in "some type of inequitable conduct," [quoting *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977) ] . . . that the misconduct have [sic] "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant," and that the subordination "not be inconsistent with the provisions of the Bankruptcy Act." *Ibid.* . . . .

*United States v. Noland,* —— U.S. ——, ——, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996). *Accord, In re Beck Rumbaugh Associates, Inc.,* 114 B.R. 418, 421–22 (E.D.Pa. 1990); and *Comtec Industries, supra,* 91 B.R. at 347.

We previously held, at pages 79–81 *supra,* that Lift was an active participant in the fraudulent conveyance of all or most of Main's assets to, ultimately, Columbusco. This conduct is clearly inequitable conduct which greatly unfairly disadvantaged Main's creditors. The ends of the Code, specifically the policy expressed in 11 U.S.C. § 548(a)(1), are served by subordinating the claims of a party engaging in such activity.

We therefore have little hesitation in striking the purported claim of Lift against Main in its entirety.

## D. *CONCLUSION*

An Order consistent with the conclusions reached in the foregoing Opinion will be entered. It occurred to us, however, that Miller, Main's Trustee, and Main's counsel may wish to confer to determine how the transfer of Philly Rock to Trustee Miller's control can best be accomplished in a manner which will preserve the value of that asset. Our Order therefore requires parties interested in that issue to address how they propose to accomplish the end in a submission filed and served by September 19, 1997. Also, our Order will require the parties interested in the issue of the amount of Arch's claim to address the final resolution of that matter in light of the *Blatstein I* decision, in a submission of September 19, 1997. Status conferences are thereafter scheduled on September 23, 1997, to determine how we will proceed on both of these matters, as well as to establish bar dates for filing claims and dates by which the Trustees project that they will file their Final Audit papers and complete administration of these cases.

### *ORDER*

AND NOW, this 8th day of September, 1997, upon consideration of record established at the consolidated trial of the above-captioned proceedings ("the Proceedings") on May 1, May 7, May 9, May 12, May 21, May 29, and May 30, 1997, and at the hearing of June 11, 1997, on the Objection of 718 ARCH STREET ASSOCIATES, LTD. ("Arch") to the proof of claim of Morris Lift ("the Lift Objection"); the parties' respective post-trial submissions relevant to the Proceedings and the Objection; noting our receipt of an Opinion and Order of August 26, 1997, in C.A. No. 97–3739 (E.D.Pa.) ("the D.C. Opinion") remanding the issue of the objections to the proof of claim of Arch ("the Arch Objections") to this court; and desiring to obtain the input of the interested parties as to what procedures for administration of these cases, this court should follow in light of its decision in the proceedings, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in part in favor of the Plaintiffs in the Proceedings and against the Defendant Debtors, MAIN, INC. ("Main"), ERIC J. BLATSTEIN ("Blatstein"), and Defendant COLUMBUSCO, INC. ("CC").

2. The transfer of the assets of Main to CC, specifically all of the assets of Philly Rock Bar and Grill ("Philly Rock") to CC, is hereby SET ASIDE as a fraudulent conveyance of same. CC shall transfer all assets formerly owed by Main in its possession to Plaintiff–Trustee MITCHELL MILLER at a

date and upon conditions to be established after September 23, 1997

3. Blatstein's bankruptcy discharge is DENIED pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(7).

4. All other relief sought by the Plaintiffs in the Proceedings is DENIED.

5. The Lift Objection is SUSTAINED. The claim of Lift against Main is STRICKEN in its entirety.

6. Miller and Main shall, and any other interested parties may, file and serve upon all parties listed below and the court in chambers, on or before 4:30 on September 19, 1997, a statement of when and how they believe that this court should effect the transfer of Philly Rock to Trustee Miller and any brief or legal memoranda which they desire supporting same.

7. Counsel for Arch and the Objectors to Arch's proof of claim shall, and any other interested parties may, file and serve upon all parties listed below and the court in chambers, on or before 4:30 P.M. on September 19, 1997, a statement of their calculation of Arch's claim in light of the D.C. Opinion and how they believe that this court should proceed on remand (specifically, is an additional hearing appropriate or required on the issue of "surrender" or "repossession" of the premises or any other issue?) and any briefs or legal memoranda which they desire supporting same.

8. Status hearings to address the issues noted in paragraphs 6 and 7 *supra* and to fix bar dates and deadlines for administration of the Debtors' cases are scheduled at the following date, time, and place, after which this court will decide how it will proceed:

TUESDAY, SEPTEMBER 23, 1997, at 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia PA 19107.